[No. 29990. Department One. July 31, 1947.]

J. C. PICKERING et al., *Respondents and Cross-appellants,* v. HAROLD HANSON et al., *Defendants,* CRESCENT U. DRIVE COMPANY, *Appellant,* GEORGE LIVINGSTON et al., *Respondents.*[1]

*Newton & Newton* and *Lewis A. Bell,* for appellant.

*Cooper & Cooper,* for respondents and cross-appellants.

*A. E. Dailey,* for respondents Livington et al.

[1]Reported in 183 P. (2d) 487.

ROBINSON, J.—Although this cause comes here both by appeal and cross-appeal, and numerous parties are involved in the controversy, but one question is presented for our consideration and decision. The *dramatis personae* (omitting wives) is as follows:

George Livingston, a resident of Everett, Washington, who, in April, 1945, was building a summer home on Camano Island.

Harold Hanson, William Hanson, and Arlie Gilliland, who, as partners, operated in Everett the Crescent Automotive Service, hereinafter called "Crescent."

Crescent U. Drive Company, hereinafter called "U. Drive," a corporation, all of the stock of which was owned by the three partners listed in the preceding paragraph. It owned and kept trucks on the same premises occupied by Crescent, which were rented by Crescent on an hourly or mileage basis.

Victor Herr, a high school boy, employed by Crescent during nonschool hours.

J. C. Pickering, who operated a gas station at Stanwood, Washington, on the route from Everett to Camano Island.

On April 18, 1945, Livingston, desiring to transport some lumber from Everett to Camano Island, rented a U. Drive truck. Victor Herr was employed (by someone) to drive it. At Stanwood, Herr, in making a turn, negligently ran into Pickering's service station, causing damage in the amount of $618, plus $25 loss of rental. Pickering, finding it difficult to determine on whom liability rested, brought this action against Livingston, the U. Drive corporation, and the Crescent partners. The case was tried by the court, and judgment entered for $643 against U. Drive only. Pickering appeals, contending that he should have also had judgment against Livingston and Crescent. U. Drive appeals, contending that judgment should have been rendered against Livingston only. Livingston, on his part, filed a brief in support of the judgment entered. That Pickering is entitled to a recovery against someone in the amount of $643 and costs is not questioned. The single but difficult problem presented is: Whose servant and agent was Herr at the

time he negligently caused the damage for which recovery is sought.

█ The presumption is that Herr was the servant of U. Drive, the truck owner.

"It is well established that, in tort cases, where the vehicle doing the damage belonged to the defendants at the ·time of the injury, that fact raises the presumption, or establishes *prima facie*, that the vehicle was then in the possession of the owner, and that whoever was driving it was doing so for the owner." *Davis v. Browne*, 20 Wn. (2d) 219, 229, 147 P. (2d) 263.

But such a presumption may be overcome.

"In conformity with almost unanimous authority, including all of our own cases without exception, we adhere to ·the rule that, when it is shown that a person owns an automobile concerned in an accident, it is presumed as an inference of fact that the driver was the agent of the owner and was acting within the scope of his authority. . . .

"Departing, however, from the rule as heretofore declared in a number of our own cases to the effect that such presumption may be overcome only by *disinterested* testimony, and following what we conceive to be the correct rule as declared by the great weight of authority, including many decisions of this court, we now hold that the presumption may be overcome by competent evidence from either *interested or disinterested* witnesses, provided that their testimony is uncontradicted, unimpeached, clear, and convincing. When evidence of that degree and character is submitted by the defendant, the presumption disappears entirely from the case, casting upon the plaintiff the burden of producing *competent evidence* to meet the evidence of the defendant, and of establishing by a preponderance of the evidence the fact that, at the time of the accident, the driver of the offending automobile was the agent of the owner and was acting within the scope of his authority." *Bradley v. Savidge, Inc.*, 13 Wn. (2d) 28, 63, 123 P. (2d) 780.

In this case, the evidence was such that the presumption early disappeared from the case and in no way influenced the trial court's decision. On a consideration of all the relevant testimony, the court entered the following pivotal finding of fact:

"5. That at the time of said accident the said Victor Herr was not the servant of the defendants, George Livingston and Jane Doe Livingston, his wife, but was the servant of said defendant, Crescent U-Drive Company, a corporation."

The U. Drive company attacks that finding. We are, therefore, called upon to weigh the evidence. On direct examination, Livingston testified, in part, as follows:

"Q. Under what circumstances did you secure that truck? A. Well, I asked him [William Hanson] for a truck to haul some lumber to the beach. . . . Q. And what was your conversation with him? A. Well, I asked him for a truck to haul some lumber to the beach and he said, 'All right.' I said, 'I'm not going to drive it. I have to have a driver,' and he said, 'We don't have drivers, but there is a boy here that does some driving for us and maybe he will take the trip,' so he called the boy and he said, 'Well, I'll phone my mother and if she don't have any objections, I'll go.' So he phoned his mother and while he was phoning a gentleman came in for gasoline and Mr. Hanson — I guess that's the gentleman's name—was busy pumping gasoline for him and the boy come back to me and said 'All right' and I said, 'Would you come out to the house at five o'clock?' and I gave him the house address, and that was all there was to that. Then at five o'clock he came out with the truck and I helped him load it and he left at five-thirty for the beach.

"Q. Where was the beach? A. Well, Camano Island. Q. Go ahead. A. Well, I said, 'Do you know the road to Camano Island?' and he said, 'I do.' I said, 'All right, then, the only way you can get mixed up is the first turn-off at the top of the hill goes to Juniper and if I am there first, I'll wait for you, and if I'm not there, you wait for me.' So I came back to my place of business, closed up and left five minutes to six. The truck had thirty minutes start of me. We drove all the way to the beach and didn't see the truck anywhere so I left my wife at the cabin and I came back — I had my car — to Stanwood to see where I could find the truck. When I got there I saw the truck at the stop light so I turned around in front of — over at the intersection there in front of Bailey's law office, and came back and I thought, if he goes straight, I'll head him off, so I went down the road to Camano Island and he went around the block and was coming back and I motioned to him and then I stopped in this intersection and he went by me and went down the

street and that's when he went to turn around was where the accident occurred, . . .

"Q. Did you in any way direct the driver which way he should drive the car? A. No, sir. I asked him if he knew the road to Camano Island. If he hadn't I would have drew it out for him. I said, 'I'll meet you at the top of the hill after you cross Davis Slough.' Q. Did you have any discussion with him as to what you were to pay him? A. No, sir, that never was mentioned. Q. Who did mention it, if anybody? A. Nobody, until the next morning. . . . Q. What did he [William Hanson] say about furnishing you a truck and driver? A. I just explained to you. He said, 'We don't keep drivers but I have a boy who drives for us once in a while. Maybe he will take the trip.' Q. Did he say who the boy was working for? A. I didn't even know his name. Q. There wasn't any discussion? A. No, sir. Q. Where was the boy when you first saw him down there? A. At the station where I saw him. Q. What was he doing? A. I don't know. He was in the back — back where they have parts, I think, or something. Q. In the parts department? A. He might have been. He came out from the back there."

The above quotation from Livington's testimony in chief may be amplified by the following excerpts from his testimony on cross-examination:

"Q. Did you ask Mr. Hanson for a driver? A. Yes, sir. Q. What did he say to you? A. He said just as I said. He thought this boy that drove for them once in a while would take the trip. Q. Did he introduce you to this boy? A. Yes. Q. Had you ever met this boy before? A. No, sir. Q. When he introduced the boy to you, did he then stay around and take part in the conversation which you had with the boy? A. Mr. Hanson? Q. Yes, Mr. Hanson. A. No, he stopped to wait on a customer. Q. Did you talk to Mr. Hanson about who was to pay the boy? A. No, sir. . . . Q. Did you talk to Mr. Hanson about what you were going to haul in the truck? A. I think I told him lumber, I don't remember that. . . . Q. Did you talk to Mr. Hanson about where you were to take the truck? A. Yes. Q. Did he ask you where it was to go? A. I don't know whether he did or not. . . . Q. Did Mr. Hanson tell you that the boy was his employee? A. No, there was nothing said neither way about that. . . . Q. Did you tell Victor Herr, the boy, when to start work? A. No, sir. Q. You testified — A. (Interposing)

No more than I wanted the truck at five o'clock. Q. You told him then that you wanted the truck at your place at five o'clock? A. That's right.

"Q. Did you tell Victor Herr where to drive to? A. I did in that way. I said, 'Do you know the road to Camano Island' and he said 'I do.' Q. It was an empty truck when it came to your house. Did you instruct him what to carry? A. We loaded the lumber together. Q. You helped him load the lumber? A. I sure did. Q. Did you give him any instructions as to what road to take after he got to Camano Island? A. No, I told him to wait at the top of the hill at the first turn-off. Q. Then your instructions were to him that he was to get to Camano Island and wait at the top of the hill? A. Yes, after you cross the bridge. . . . Q. You told him to wait there? A. Wait for me and I would direct him down, or if I was there I would wait for him. . . . Q. You testified, now, that at Stanwood you met the truck and the driver, Victor Herr. Did you give him any directions when you were in Stanwood, either by word of mouth or motion? A. Just by motion. I motioned that way (indicating) at the intersection a block away from the station. Q. You signalled to him? A. Yes, to go straight ahead instead of turning toward town. . . . Q. Did Mr. Hanson at any time tell you you couldn't take the truck anywhere else but Camano Island? A. It never was mentioned. Q. Didn't talk about it at all? A. No, sir. . . . Q. Did Mr. Hanson say anything to you which would restrict your hauling of articles upon the truck? A. No, sir."

As to the hiring of the truck, William Hanson, one of the partners, on direct examination, testified, in part, as follows:

"A. Mr. Livingston came in. I recognized him, knowing he had been the locksmith in Everett, and he came in inquiring if we had some trucks for rent. He had some lumber to haul. I said, 'Yes, we have' and I remember asking him — which we do all the customers — the length of the lumber and he told me it was — some of it was fourteen feet long, some sixteen, and about how much he had. I think it was around 1500, 1700 board feet. I told him one of our vans would easily handle that. We are very much concerned with what goes into those trucks and the type of drivers that take the trucks so we generally ask them these various questions, where the truck is going, in order to know how much gas to put in the tank, so George said that

he wanted to go up to Camano Island. He had a summer home up there and he had been trying to get some lumber up there and he needed a truck. I said that we could handle that very easily and he asked the rates and I told him it was $1.50 an hour or 18¢ a mile, which is our regular charge, whichever would be the highest. . . . And then he said, 'You got a driver?' and I said, 'No, this is a U-Drive truck.' He said, 'I want to take my own car up there. I didn't want to drive the truck.' 'Well,' I said, 'We don't have drivers. We never have. That's a U-Drive. That's why you save half by taking the truck yourself and doing all the work,' and he said, 'Do you know of any driver I can get?' so I said, 'No, I don't, right now. Men are scarce.' The war was going on and not many men were available. I happened to be looking out on the street and I saw a young fellow that had been using the truck, or had been driving for the Y.M.C.A., and at high school and a capable driver, and I said, 'There's a young fellow you could get. I know he is capable.' 'Well,' he said, 'would you call him in?' I noticed that Vic had an instrument under his arm. I don't know why. It's unusual that he would come by that way in the morning. That's the first time I had seen him go to school so I called him in and introduced him to Mr. Livingston with this remark, that 'Mr. Livingston is looking for a driver to take some lumber up to his summer cottage up by Stanwood' and I said, 'You two go ahead and settle your problems. I've got a customer out in front' and that was the end of that.

"Q. You asked him where he was going with the truck? A. Yes, I did. Q. Where did he tell you? A. He said he was going to East Stanwood, or Camano Island. I knew it was by Stanwood some place. I knew it was in that area. Q. And he was only to have the truck for that particular purpose, to go up there? A. He could go as far as he wanted to. He could go any place. As long as he hired the truck it didn't make any difference to us if he goes any place in Washington or Oregon, providing the truck is taken care of properly and they are capable of taking care of it, that's all. Q. I thought you were interested in knowing where they are going? A. We are interested in knowing for the reason that we have other parties coming in wanting to know when the truck is coming back. At that time we were closed at seven o'clock and we generally like to be in when the truck comes in and complete the deal, you know, and at the same time, maybe there is somebody else that would like to have a truck so we can tell the next party

they will have a truck at eight o'clock or nine o'clock, and that's why we ask these various questions."

On cross-examination, Hanson further testified as follows:

"Q. After you knew Livingston had a truckload of lumber going to Camano Island, did you tell the boy what the trip was? A. No. There was no discussion between me and Vic at all. Q. When you called the boy in, what did you say to him? A. I called him in and I said, 'Vic, Mr. Livingston here is looking for a driver to take one of the U-Drive trucks up to East Stanwood some place up there. He is looking for a driver. Would you be interested?' 'Well,' he says—he made some remark, I don't know what it was at the time. . . . I went outside. Q. Did you hear the boy say he would have to ask his mother? A. No, I didn't hear that. I saw him at the phone in a minute or two, but I was outside."

Victor Herr was in military service at the time of the trial, and his testimony appears in the record per written interrogatories and answers thereto. He testified that, in April, 1945, he was going to school full time but was working for U. Drive on Saturdays, and sometimes after school. He had never driven a U. Drive truck for a renter; nor did he ever know of an instance where U. Drive supplied a renter with a U. driver. In much of his testimony, he merely states conclusions. For example:

"Q. Who did you drive the truck for? A. A man named Livingston, a locksmith in Everett. He had hired a truck from the Crescent Automotive Service and hired me to drive the truck as an outside job, not as an employee of Crescent Automotive Service."

"Q. Did you at any time on April 19th, 1945, consider you were employed by Bill Hanson or the U-Drive Co.? A. No, sir."

He further testified that, when asking him if he would drive the truck, Hanson indicated to him that he would be paid by Livingston.

"Q. Did he [Livingston] at any time the afternoon and evening of April 19th, 1945, offer to pay you for your services? A. Yes. When we arrived at his summer home, he asked me what was the fee he owed me and I told him I would collect it through Crescent Automotive."

Later, during the trial, Livingston testified, in rebuttal, as follows:

"Q. He states in his deposition that when you arrived at the summer home he asked you, 'He asked me what was the fee he owed me and I told him I would collect it through Crescent Automotive.' Did you have any such conversation? A. No, I don't think so. Q. Pardon? A. No, I don't think so. Q. Well, do you know whether you did or not? A. I didn't ask him anything."

The final answer is all-embracing, but, considering the effort required to obtain it, it is not too convincing.

On the next morning after the accident, Livingston and Herr were at the Crescent premises and informed Gilliland, one of the partners, of the accident, and, according to Livingston, Gilliland said that Crescent was covered by insurance. (However, it turned out that the insurance covered only fire and theft.) Gilliland testified that Livingston wanted a statement of the amount he owed, and that he ascertained the mileage and computed the truck rental, and added the customary ten per cent insurance charge; and further testified that Livingston then said: "Put the boy's wages on there for him driving the truck and I'll mail you a check for the whole thing." Livingston denies having made any such statement. However that may be, the bill rendered to Livingston (exhibit E), and which he afterwards paid, contained the following items: for truck hire, $12.24; insurance, $1.25; driver, $3.75.

T. J. Goodin, accountant for Crescent, and also U. Drive, testified that all the workmen, including Victor Herr, were invariably paid by check, on the Tuesday following the week the work was done. The amount due a workman was determined by his timecard, which the workman himself punched when he came to work and when he quit. Victor Herr's timecard covering the work he did during the week beginning on Monday, April 15th, and ending Saturday, April 20th, is exhibit No. 2. It shows that the only time he worked that week was six hours, and that, on Saturday, April 20th. No time was punched on the card on the day he drove the truck from Everett to Camano Island.

The payroll covering the week in question shows that Herr was paid for six hours' work only, these six hours having been worked on Saturday, April 20th.

Gilliland, in testifying, said he did not know how or when or if Herr was paid the $3.75, and suggested that the bookkeeper might be able to tell. The bookkeeper, who was later called, was unable to do so but thought he could find out, though it might take him an hour. The plaintiff asked the court to order him to do so, even though it might delay the trial. He returned to court with a cash-register slip, the writing on which he testified was Herr's, which showed that Herr was paid the $3.75 in cash on April 28th, nine days after the trip.

Two weeks after the trial, the trial court rendered a comprehensive opinion in the matter, discussing at some length the questions of both fact and law. In the opinion, the following is quoted from *Olson v. Clark,* 111 Wash. 691, 191 Pac. 810:

" 'Over the objection of appellants, the court gave the jury the following instruction:

" ' "Members of the jury, it is the law that one who hires from another a vehicle and driver, and agrees to pay therefor a given amount per day, is responsible for any accident or injuries caused by such vehicle and driver, if due to the negligence and want of care of the driver, even though such driver might be paid by the owner of such vehicle. In other words, after the owner has turned such rented vehicle and driver over into the control of the person renting or leasing same, then such latter person stands in the same position with third persons as though he were the owner, and is liable to any third persons for all injuries caused by such vehicle, or truck, due to the negligence and want of care of the driver of same." '

" 'We think this instruction correctly stated the law as laid down in *Olsen v. Veness, supra* [105 Wash. 599, 178 Pac. 822].' "

On its face, the above-quoted instruction would appear to require a peremptory holding in the instant case that Herr was the servant of Livingston; but, as the trial court pointed out, when the instruction is considered in the light

of the facts of the case in which it was given, as all such general pronouncements must be, it loses much of its force.

The opinion analyzes the "loaned servant" cases on which the U. Drive places considerable reliance, and concludes that they are not applicable to this situation. As we have come to the conclusion that Herr was not in fact a loaned servant, we will not discuss that question.

The court grounds its decision largely upon a section of the article on Master and Servant in 39 C. J. 1277, entitled as follows: "Driver and Team Hired to Third Person. (aa) In General." The decisions cited in support of the text are, for the most part, livery stable cases, which may or may not be a ground of distinction. However that may be, we think that the major ground upon which the trial court arrived at decision is expressed in the two following sentences:

"This case, I believe, is more analogous to the hiring of a drayage firm to do a certain job or the employment of a taxi driver. It is well settled that the relationship of master and servant does not arise between the person hiring a drayage truck or taxi and the driver of such truck or taxi, even though the hirer may give quite minute directions as to what he wants carried or how he wants it carried or where he wants to go."

With the second sentence above quoted, we entirely agree. Obviously, one who contracts to pick up some goods at one place and carry them to another, which is what a drayman does, undertakes to bring about a certain specified result, and, in order to do so, must have control of the operation, and, if he hires another to do the actual work involved, that other is his servant. It seems to us that there is no analogy between such a transaction and the transaction in this case. In the first place, it cannot be said that U. Drive ever undertook to transport Livingston's lumber to Camano Island. Furthermore, it is quite apparent that Livingston himself did not contemplate entering into a drayage contract. He had some lumber at Everett which he wanted transported to Camano Island. He went to the U. Drive company and—but let us consider his own testimony:

"Q. Under what circumstances did you secure that truck? A. Well, I asked him [William Hanson] for a truck to haul some lumber to the beach. . . . Q. And what was your conversation with him? A. Well, I asked him for a truck to haul some lumber to the beach and he said, 'All right.' I said, 'I'm not going to drive it. I have to have a driver,' and he said, 'We don't have drivers, but there is a boy here that does some driving for us and maybe he will take the trip,' so he called the boy and he said, 'Well, I'll phone my mother and if she don't have any objections, I'll go.' So he phoned his mother and while he was phoning a gentleman came in for gasoline and Mr. Hanson—I guess that's the gentleman's name—was busy pumping gasoline for him and the boy come back to me and said 'All right' and I said, 'Would you come out to the house at five o'clock?' and I gave him the house address, and that was all there was to that. Then at five o'clock he came out with the truck and I helped him load it and he left at five-thirty for the beach."

Livingston went to the U. Drive company and "asked him [Hanson] for a truck to haul some lumber to the beach." Hanson said, "All right." Livingston said, "I have to have a driver." To our minds, this does not present a picture of a man employing another to transport his goods, but one who is attempting to secure the instrumentalities with which to carry out a project of his own. His words were, "I have to have a driver." He clearly intended to transport the lumber himself, and, in order to do so, needed a truck and a man to drive it.

We are further of the opinion that the preponderance of the evidence shows that Livingston himself employed Herr to drive the truck. There is no evidence that Hanson ordered, or directed, or even requested, Herr to do so. After Hanson introduced Herr to Livingston, Livingston dealt exclusively with Herr. He had no further contact with Hanson whatever. According to Livingston's own evidence, whether or not Herr could go, or would go, was not a matter for Hanson's decision but depended upon securing the consent of Herr's mother. Livingston and Herr had a talk. Herr telephoned his mother and, according to Livingston, came back and said: " 'All right,' and

I said 'Would you come out to the house at five o'clock?' and I gave him the house address."

Both Herr and Livingston testified that Livingston did not ask Herr how much he would charge for driving, and it is urged that from this fact an inference arises that he did not employ Herr. But whatever effect may be given to that is, we think, counterbalanced by the following testimony of Livingston, given on direct examination:

"Q. Did you have any discussion with the Crescent Automotive Service or the Crescent U-Drive Company representative concerning the charge for the use of the truck? A. I never asked them until the next morning when I paid that bill."

While Herr's statement that he considered himself employed by Livingston, and not by Crescent or U. Drive, is a mere conclusion, there is convincing evidence that he so believed. He did not punch his timecard when he took the truck and drove to Livington's house. The card also indicates that he was not working for Crescent or U. Drive at the time Livingston asked him to drive the truck. *There is no time punched on his card for that day at all.* This also tends to support Hanson's testimony that he called Herr off the street to ask him if he would care to drive the truck for Livingston instead of calling him out of the shop, as Livingston testified.

There is much to indicate that Hanson was not in a position to order or direct Herr to drive the truck. Herr was an irregular employee of the U. Drive, working on Saturdays and sometimes after school. There is quite convincing evidence that he was not working for U. Drive on the day Livingston rented the truck. The timecard and the payroll indicate that he was not, and it would seem that, from Livingston's own evidence, at the time he asked Herr if he would drive the truck the boy was subject to his mother's control rather than Hanson's or U. Drive's.

We are mindful of the fact that the timecard is in the nature of self-serving evidence. But there is no reason to suppose that it is not a genuine shop record. It is complemented and reinforced by the cash-register slip evi-

dencing the payment of the $3.75 to Herr. This piece of evidence was brought into the case at the request of the plaintiffs' attorney, not by U. Drive and, according to the testimony of the bookkeeper, was partially in the handwriting of Herr, who, at the time of the trial, was out of the state in military service.

We are unable to accept the theory that the transaction was analogous to a drayage contract, or that this is a case which falls under § 1463, Driver and Team Hired to Third Person, 39 C. J. 1277. Nor do we think that Herr was a loaned servant. On the other hand, we think that the preponderance of the evidence establishes that Mr. Livingston intended to transport some lumber from Everett to Camano Island; that, as a means of so doing, he procured a U. Drive truck, and, not desiring to drive it himself and finding that U. Drive did not furnish drivers, upon Hanson's suggestion, took the matter up with Herr, who worked part time for Crescent and U. Drive, but was not so working on that day. Herr, after securing his mother's consent, agreed to accept the employment. Livingston told him to bring the truck to his house about five o'clock. From that hour until about nine o'clock in the evening, in our opinion, he was the servant and employee of Livingston, assisting him in transporting his lumber to Camano Island.

The judgment appealed from is reversed, and the cause is remanded for entry of judgment in favor of plaintiffs, Pickering and wife, against Livingston and wife. It is so ordered.

MILLARD, JEFFERS, and SCHWELLENBACH, JJ., concur.